IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

UNITED STATES OF AMERICA,

           Plaintiff,

v.                                    CRIMINAL ACTION NO. 2:09-cr-00223

TOMMY EDWARD YOUNG SR. and
TOMMY EDWARD YOUNG JR.,

           Defendants.

**MEMORANDUM OPINION AND ORDER**

Pending before this Court is the Motion to Suppress by Defendants Tommy Edward Young, Sr. (Young, Sr.) and Tommy Edward Young, Jr. (Young, Jr.) [Docket 41-4; Docket 68-1].[1]

At a hearing held on February 12, 2010, the defendants were present in person and by counsel, Matthew A. Victor for Young, Sr. and Jane C. Moran for Young, Jr., and the United States appeared by Assistant United States Attorneys Susan M. Robinson and Thomas C. Ryan.

Defendant Young, Sr. challenges the constitutionality of two separate searches: one that occurred without a warrant on March 10, 2006, and a second that occurred on March 30, 2006, for which a warrant was issued.[2] Defendant Young, Sr. filed a fully briefed Motion to Suppress on

---

[1] At the hearing, the Court granted Defendants' motions for Adoption of Co-Defendant's Motions [Docket 41-5, Docket 45, Docket 68-3]. As both parties have adopted the motions filed by the other party, and both Defendants are implicated in the outcome of the Motion to Suppress, the Court draws no distinction between the defendants with respect to who filed the motion.

[2] The Youngs do not actually own the property on which the search took place—it is actually owned by someone with the last name Boyd. Although not addressed by either party, this Court concludes that the Defendants have standing to raise the claim. *See United States v. Gray*, 491 F.3d
(continued...)

January 25, 2010, and the Government responded on February 5, 2010. Based upon the motion papers and the matters presented at the hearing conducted by this Court on February 12, 2010, the Court will address the motion more fully below.

### A. MARCH 10, 2006 SEARCH

*A. Factual Background*

On the morning of March 10, 2006, the Clay County Sheriff's Department received a telephone call from Gary O'Brien, a neighbor of the Youngs. He reported that he had observed a piece of equipment—in this case, a Bobcat mini excavator—being unloaded and trammed up the hill that led to the Defendants' property the night before. Mr. O'Brien recognized the trailer carrying the Bobcat and one other vehicle, a white truck, as belonging to the Youngs. After receiving the phone call, Sheriff Randy Holcomb requested air transportation via a West Virginia National Guard helicopter to try and locate the Bobcat. Sheriff Holcomb boarded the helicopter and flew to and above the Youngs' residences and property approximately 300-500 feet above the ground. After he spotted the Bobcat in a clearing in the woods near Defendants' residences, Sheriff Holcomb directed Deputy J.R. Paxton to the location of the Bobcat.

To reach the Bobcat, Deputy Paxton drove up the hill from Ovepa Road onto Oilfield Road, where the Youngs reside. The road is a county road up to a certain point near Young, Jr.'s residence, and then becomes a private road on which various parties, including Triad Resources, have rights-of-way. Deputy Paxton testified that a gate across the road was closed. This gate was on the county portion of the road. He opened the gate, and proceeded up the hill, past the Youngs'

---

²(...continued)
138, 144 (4th Cir. 2007) ("Co-tenants, co-owners, and co-occupants can also avail themselves of the Fourth Amendment's protection.") (citing *Georgia v. Randolph*, 547 U.S. 103 (2006)).

residences, and drove onto an access road that led to an abandoned gas well.[3] The road driven to reach that point was on Defendants' property. The location of the Bobcat itself is disputed, but the uncontroverted testimony indicates that it was near a property line and may or may not have been on Defendants' property. Once there, Deputy Paxton located the Bobcat and confirmed that the machine had been stolen. After this, Deputy Paxton called for assistance, and removed the Bobcat from the property.

   *B. Legal Analysis*

The Fourth Circuit has conclusively established that aerial surveillance of a person's property does not constitute a violation of the Fourth Amendment. *California v. Ciraolo*, 476 U.S. 207, 213-14 (1986) (finding aerial surveillance of a home's curtilage from public navigable airspace not to violate the Fourth Amendment). In this circuit, aerial surveillance has been upheld at altitudes of as low as 100 feet. *See, e.g.*, *United States v. Breza*, 308 F.3d 430, 432-33 (4th Cir. 2002) (upholding helicopter search at height of 200 feet); *Giancola v. W. Va. Dep't of Public Safety*, 830 F.2d 547, 550-51 (4th Cir. 1987) (upholding helicopter surveillance from 100 feet).

The testimony presented before the Court established that Sheriff Holcomb flew approximately 300-500 feet above the ground when surveying the Defendants' property. That evidence was never challenged by Defendants. The Court finds that the helicopter search complied with this Circuit's requirements, and thus the Defendants' Fourth Amendment rights were not violated by this surveillance.

---

[3] Because Triad Resources, who owns mineral rights on this property, deals in both oil and gas, the specific nature of any particular well is unclear from the record. Whether the well is one for oil or gas, however, does not affect the suppression analysis.

The search on the ground was conducted without a warrant. Searches performed without a warrant are presumed unconstitutional, unless they fall within one of the narrowly-defined exceptions to the warrant requirement. *Flippo v. West Virginia*, 528 U.S. 11, 13 (1999) (citing *Katz v. United States*, 389 U.S. 347, 357 (1967)). The ability to claim Fourth Amendment protection from unreasonable searches requires that the person claiming that protection have "a legitimate expectation of privacy in the invaded place." *Rakas v. Illinois*, 439 U.S. 128, 143 (1978). The defendant bears the burden to show that he has a "legitimate expectation of privacy in the area searched." *United States v. Kitchens*, 114 F.3d 29, 31 (4th Cir. 1997). Such an expectation of privacy has both subjective and objective components, and the defendant must prove both that he had a subjective expectation of privacy, and that the expectation is reasonable. *Doe v. Broderick*, 225 F.3d 440, 450 (4th Cir. 2000) (citing *California v. Ciraolo*, 476 U.S. 207, 211 (1986)).

Defendant argues, in essence, that police trespass onto private property automatically gives rise to a Fourth Amendment claim.[4] The Fourth Circuit has clearly held, however, that trespass is

---

[4] As a practical matter, Triad owned an easement over the Young/Boyd property, and the record suggested that several other property owners or mineral rights owners may have rights of way on these roads. At least one Circuit court has found that "[a] shared unobstructed road is incongruent with the common law concept of the curtilage . . . Moreover, the road is easily accessible to utility companies and police and fire departments and it is reasonable to assume that the residents would expect these public agencies to use the road in performing their services." *United States v. Roberts*, 747 F.2d 537 (9th Cir. 1984). In other words, the expectation of property owners and right-of-way owners is that public vehicles will use the road to gain access to perform their duties, and this implicit invitation gives police a right of access on these roads.

Courts in several states have likewise held that police have the right to enter access roads or walkways when engaged in official business. *State v. Chaussee*, 866 P.2d 643, 747 (Wash. App. Div. 3 1994) ("Police officers on legitimate business may enter an area of curtilage which is impliedly open to the public, such as an access route to a house or a walkway leading to a residence."); *Doering v. State*, 545 A.2d 1281, 1286 (Md. 1988) (finding no Fourth Amendment violation even if police officers were within the home's curtilage because "criminal investigation is as legitimate a societal purpose as is census taking or mail delivery") (citing *State v. Corbett*, 516

(continued...)

a separate and distinct issue from the question of whether a violation of the Fourth Amendment occurred. "[T]he prohibition in the (Fourth) Amendment is against unreasonable searches and seizures, not trespasses, [p]er se. A trespass is only relevant in this context if it represents an invasion of a defendant's reasonable expectancy of privacy." *United States v. Jackson*, 585 F.2d 653 (4th Cir. 1978) (citing *Katz v. United States*, 389 U.S. at 351-52). This follows logically, as "the Fourth Amendment protects people, not places." *Katz*, 389 U.S. at 351. Searches conducted by police that involved trespass on private property without a search warrant have been consistently upheld, despite the trespass. *See, e.g.*, *Oliver v. United States*, 466 U.S. 170 (1984) (affirming constitutionality of search on defendant's property one mile from his home when police drove onto property despite trespassing signs); *United States v. Dunn*, 480 US. 294 (1987) (refusing to find a Fourth Amendment violation when police trespassed onto defendant's property outside the curtilage and fifty yards from his home); *United States v. Vankesteren*, 553 F.3d 286 (4th Cir. 2009) (finding police placement of surveillance camera in defendant's open field to not violate the Fourth Amendment); *United States v. Breza*, 308 F.3d 430 (4th Cir. 2002) (upholding search of garden on defendant's 92 acre farm without warrant).

---

⁴(...continued)
P.2d 487, 490 (Or. 1983)).
     This Circuit has held that police officers may approach a home and speak with its inhabitants, which involves a technical trespass, but is nonetheless generally permitted. "In the absence of a fence with a locked gate, a homeowner is likely to receive visits from pollsters, door-to-door salespeople, and trick-or-treaters, among others. There is no constitutional basis for excluding police officers from this list of potential visitors. *Edens v. Kennedy*, 112 F. App'x 870, 875 (4th Cir. 2004) (citing *Rogers v. Pendleton*, 249 F.3d 279 (4th Cir. 2001) (holding that "police officers do not need a warrant to do what any private citizen may legitimately do—approach a home to speak to the inhabitants")).

A person has a reasonable expectation of privacy in his home and the curtilage, the land immediately surrounding the home. *Oliver v. United States*, 466 U.S. 170, 180 ("The distinction implies that only the curtilage, not the neighboring open fields, warrants the Fourth Amendment protections that attach to the home."). There is no right to privacy in open fields, and "an individual may not legitimately demand privacy for activities conducted out of doors in fields, except in the area immediately surrounding the home." *Oliver*, 466 U.S. at 178; *United States v. Ramapuram*, 632 F.2d 1149, 1155 (4th Cir. 1980) ("[N]o Fourth Amendment protection extends to open fields."). To determine if property is curtilage or open fields, courts are to consider four factors: (1) the proximity of the area to the home, (2) the presence of an enclosure connecting the property to the home, (3) how the property is used, and (4) steps taken to prevent observation of the area by passers-by. *United States v. Vankesteren*, 553 F.3d 286, 289 (4th Cir. 2009) (citing *United States v. Dunn*, 480 U.S. 294, 301 (1987)).

Applying these four factors to the location where the Bobcat was located leads inevitably to the conclusion that the Bobcat was found in open fields.[5] The property where the Bobcat was located was at least 500 feet from the Youngs' residences through a wooded area, and there was no enclosure connecting that property to the home.[6] The property was undeveloped, save the existence

---

[5] For purposes of this analysis, the Court assumes that the property on which the Bobcat was found is part of the tract on which the Defendants live. No conclusive evidence was presented during the course of the motions hearing to identify where the property line was, or that the property was definitively part of the same tract. The Court does conclude, however, that the property was near the property boundary. This fact alone creates an additional factor against finding the site protected, as the other property owner could have seen the Bobcat from his property without trespassing, and Defendants had done nothing to obstruct that view.

[6] Mike Horan, Vice President of Triad Resources, testified that he would guess the property to be approximately 500-800 feet from the Young/Boyd residence. Deputy Paxton provided slightly
(continued...)

of an abandoned gas well. Finally, no steps were taken to prevent observation of the area by passers-by. The testimony of Mike Horan, the Vice President of Triad Resources, established that Triad leases mineral rights on the property where the Youngs live, and has right-of-way access to wells. Mr. Horan further testified that the wells are checked daily, and that the workers would cross the property every day.

The only step arguably taken by defendants to protect the privacy of these fields consists of a gate built across Oilfield Road, leading to the Youngs' residences. This evidence is unpersuasive to the Court for two reasons. First, the evidence presented indicated that, at the point where the gate was built, the road was still a county road, not an entrance to private property. It was not conclusively determined that the gate actually belonged to the Youngs, or even that the property on either side of the road was part of the Young/Boyd property. The Court does find, however, that the gate was placed across a public road, which is prohibited by West Virginia Law. *See* W. Va. Code § 17-16-1 (defining "fences, buildings, or other obstructions within the bounds of a public road" as an "obstruction" and a "public nuisance"). Second, even assuming that the road was private at that point, testimony also established that the gate was almost never closed. Indeed, the Youngs could not properly restrict access to the property, as Triad workers had a right of access to the property and all wells on it. Triad's daily use of the access road also undermines the Youngs' claims to have a reasonable expectation of privacy in this land. Each day Triad employees lawfully passed in front of the Youngs' residences and traversed the various access roads to reach the well sites. It defies

---

[6](...continued)
different numbers, concluding that the property was 200-400 yards (or 600-1200 feet) from the home. As the difference in the figures makes no material difference in determining the validity of the search, the Court adopts the lower figure of 500 feet for purposes of the analysis.

logic to find that, despite this daily observation, the Youngs still expected the activities taking place on this property to remain strictly private and free from observation.

Taking all factors together, the Court concludes that Deputy Paxton could drive through Defendants' property on the road, that the Bobcat was found in open fields, and thus the officers did not violate the Defendants' Fourth Amendment rights by searching, either by air or by land, the place where the Bobcat was found. Thus, the Motion to Suppress with respect to the March 10, 2006 search is **DENIED**.

### *B. MARCH 30, 2006 SEARCH*

*A. Factual Background*

On March 30, 2006, the Clay County Sherrif's Department again received a phone call, this time from an anonymous well tender for Triad Resources. The well tender told authorities that there was a fairly new trailer parked at one of Triad's well sites. The trailer and the well site were located approximately one-quarter mile from the Youngs' residences, and were not on their property. To get to the well site, Sheriff Holcomb had to drive past the Youngs' residences. When he got to the well site, the trailer was missing its VIN number, so Sheriff Holcomb called for assistance to remove the trailer from the well site and take it to a storage area. While traveling to and from the well site, Sheriff Holcomb observed four equipment trailers sitting along the side of the road near Young, Sr.'s residence. Although he did not stop at that time, he recalled that two trailers had recently been reported stolen, the description of one of which matched one of the trailers located along the road.

Sheriff Holcomb then went to obtain the search warrant. (Exhibit 5.) The warrant identified the alleged crime as "BRINGING STOLEN PROPERTY INTO THE STATE" and, identified the property as "ANY STOLEN PROPERTY, EQUIPMENT, TRAILERS AND ANY

ACCESSORIES." As a basis for the warrant, Sheriff Holcomb wrote in the affidavit that "IN THE PAST 5 WEEKS SEVERAL PIECES OF STOLEN EQUIPMENT HAVE BEEN RECOVERED ON OR NEAR THE TOMMY YOUNG/RENEA BOYD PROPERTY" and described the recovery that day of the "stolen" equipment trailer. The affidavit goes on to state that "OTHER EQUIPMENT TRAILERS WERE IN PLAIN VIEW FROM THE ROADWAY . . . 2 EQUIPMENT TRAILERS ARE MISSING AND HAVE NOT BEEN RECOVERED." The facts section indicated that the officer had reason to believe that one or more of the trailers on the Young/Boyd property was stolen.

The Clay County magistrate issued the search warrant. Sheriff Holcomb then returned to the Young property with the warrant to investigate the trailers and equipment found by the side of the road. Over the course of approximately two hours, the police were able to identify several items conclusively as having been stolen, including at least one of the trailers. In all, the officers seized the four trailers that Sheriff Holcomb had previously identified, as well as various items found within one or more of the trailers, such as tires, a fuel tank, and tool boxes. Young, Sr. was present during the search. Young, Sr.'s freedom was not restrained in any way, nor did the officers enter the house at any time.

   *B. Legal Analysis: Warrant*

Defendant challenges this search on the basis that the warrant was defective. A strong presumption of validity surrounds a warrant and any search conducted pursuant to it. *Torchinsky v. Siwinski*, 942 F.2d 257, 262 (4th Cir. 1991) (refusing to allow "mere conjecture to upset the normal presumptions surrounding a warrant's validity"); *United States v. Colkley*, 899 F.2d 297, 300 (4th Cir. 1990) (finding a "strong presumption of validity with respect to the affidavit supporting

the search warrant") (citing *Franks v. Delaware*, 438 U.S. 154, 171 (1978)).  An officer's reliance on a search warrant also carries the presumption of reasonableness.  *United States v. Leon*, 468 U.S. 897, 922 (1984) ("[A] warrant issued by a magistrate normally suffices to establish that a law enforcement officer has acted in good faith in conducting the search.").

An officer's ability to rely on a warrant is not, however, absolute.  Searches conducted when an officer's reliance on a warrant is not "objectively reasonable" are not entitled to a presumption of reasonableness, or a "good faith" exception.  *Leon*, 468 U.S. at 922.  The Supreme Court has identified four circumstances in which an officer's reliance on a warrant would be objectively unreasonable: (1) where the magistrate issuing the warrant was misled by information in the affidavit, and the affiant either knew the information was false or acted in reckless disregard of the truth, (2) where the magistrate did not act as a detached and neutral decisionmaker, (3) where the accompanying affidavit is so lacking in indicia of probable cause as to "render official belief in its existence entirely unreasonable," and (4) where a warrant is so facially deficient that the executing officer cannot reasonably presume it to be valid.  *United States v. Andrews*, 577 F.3d 231, 236 (4th Cir. 2009) (citing *Leon*, 468 U.S. at 922).

Defense counsel contends that the warrant is invalid because the affidavit is a "bare bones" affidavit, which amounts to a challenge under the third *Andrews/Leon* prong.  The Fourth Circuit defines this as an affidavit "that contains 'wholly conclusory statements, which lack the facts and circumstances from which a magistrate can independently determine probable cause.'" *United States v. Wilhelm*, 80 F.3d 116, 121 (4th Cir. 1996) (citing *United States v. Laury*, 985 F.2d 1293, 1311 n.23 (5th Cir. 1993)).  In *Wilhelm*, the affidavit was deemed to be "bare bones" because it "depended on information from an unnamed informant, and provided no indication of that informant's

10

truthfulness or reliability." *Id*. at 120. Further, the warrant "included conclusory descriptions" and contained no exact information to allow the magistrate to determine the informant's reliability. *Id*.

An affidavit will be "bare bones" when (1) it provides only unsupported and conclusory statements rather than facts, and (2) when it relies on an unknown informant whose credibility cannot be assessed. *United States v. Perez*, 393 F.3d 457, 464 (4th Cir. 2004). In other words, a "bare bones" affidavit amounts to a "take-my-word-for-it affidavit" that "states only the affiant's belief that probable cause existed." *Perez*, 393 F.3d at 464 (citing *United States v. Williams*, 224 F.3d 530, 533 (6th Cir. 2000). This phrase is usually applied to affidavits in which the affiant merely recites the conclusions of others—usually a confidential informant—without corroboration or independent investigation of the facts alleged." *United States v. Johnson*, 4 F. App'x 169, 172 (4th Cir. 2001) (citing *Wilhelm*, 80 F.3d at 117-18; *United States v. Laury*, 985 F.2d 1293,1312 (4th Cir. 1993)). The Fourth Circuit has applied this exception very narrowly. *See, e.g.*, *United States v. Perez*, 393 F.3d 457 (4th Cir. 2004) (reversing a district court's finding of a "bare bones" affidavit where the affidavit recounted a conversation with a "reliable and credible witness" regarding illegal activity at the site of the search); *United States v. DeQuasie*, 373 F.3d 509 (4th Cir. 2004) (reversing a district court who found a "bare bones" affidavit when the affidavit specifically identified the informant and had "several indicia of reliability"); *United States v. Bynum*, 293 F.3d 192 (4th Cir. 2002) (finding a valid warrant where the evidence was offered by a known and reliable informant with a prior history of providing reliable information).

In this case, the officers were not relying on an informant. All the information presented in the affidavit was collected from the officer's own observations, and no outside sources were relied upon. In particular, Sheriff Holcomb indicated that "4 other equipment trailers were in plain view

from the roadway and were parked on the Young/Boyd property. 2 equipment trailers are missing and have not been recovered." (Exhibit 5.) These are factual observations of the affiant himself and are not conclusory in nature.

During the hearing, defense counsel presented evidence that might suggest the invalidity of the warrant on other grounds—that the magistrate was "mislead" by the information in the warrant, a challenge to the warrant under the first *Andrews* prong. Testimony presented at the hearing challenged the wording of the warrant. In particular, the warrant says that "several pieces of stolen equipment have been recovered on or near the Tommy Young/Renea Boyd property" over the past several weeks. On cross-examination, however, Sheriff Holcomb was unable to specify a single piece of stolen equipment which had been located on the Young/Boyd property itself during that time, though they had been recovered nearby. Presumably, an example of this would be the Bobcat recovered on March 10 near the Youngs' property line. Further, the trailer located at the abandoned well earlier on March 30 had not been positively identified as being stolen, although Sheriff Holcomb stated in the affidavit that "a stolen equipment trailer was recovered" that day.

Although the Court agrees that Sheriff Holcomb could have been more clear in his wording, lack of polish does not render a warrant constitutionally infirm. The affidavit states clear facts upon which a detached and neutral magistrate might reasonably conclude that there was probable cause for issuing a search warrant: the presence of trailers in plain view, the trailers reported missing, the recovery of stolen property on or near the Young/Boyd property.[7] Further, Sheriff Holcomb had

---

[7] During the hearing, it became apparent that the property lines around the Young/Boyd property are not clearly marked or immediately recognizable. That property was recovered in close proximity to the Young/Boyd property was not in dispute during the hearing. The Court cannot fault the officer for not wishing to make false statements by remaining vague with respect to the exact
(continued...)

reason to believe that the trailer found earlier that day was in fact stolen, as the VIN number had been pried off a fairly new trailer. Even without this piece of information, the Court concludes that there was sufficient information in the affidavit to support a finding of probable cause by the magistrate. Moreover, the Court concludes that Sheriff Holcomb did not intentionally mislead the magistrate with the statements made in the affidavit.

### C. Legal Analysis: Without Warrant

The Court need not rely on the validity of the search warrant alone to deny the Defendants' motion to suppress. There is no need to suppress evidence obtained during this search, even if the warrant is defective, if the search falls under one of the exceptions to the warrant requirement. Two exceptions appear to apply here. The first, the "open fields" exception discussed above, would permit the search and seizure of the property if it was found not to be part of the curtilage of the home. The second, the "plain view" exception, would allow the police to search and seize property that is in plain view during a lawful search.

To decide if the search and eventual seizure was covered by the "open fields" exception, the Court must determine if the land on which the trailers were situated is considered part of the home's curtilage. Applying the four-part test from *Vankesteren*, and utilizing Government's Exhibit 2 and the hearing testimony, the Court can conclude that the property where the search warrant was executed does not fall within the home's curtilage. First, the property where the trailers were found is not located immediately next to Young, Sr.'s home, but extends down the road for a considerable distance. Second, there is no enclosure connecting the area where the trailers were found to the

---

[7](...continued)
location of the property.

13

home. The area along that portion of the road appears to solely be used for the parking and storage of vehicles, trailers, and other large heavy equipment. Finally, no steps had been taken to prevent observation of the area by passers-by. Given that the road was traveled daily by Triad workers, the Youngs could have no reasonable expectation of privacy in this location.

Once Sheriff Holcomb determined that the trailers were stolen, the "plain view" exception permitted him to seize the equipment. Police may lawfully seize evidence in plain view during a lawful search if three conditions are met: "(1) the seizing officer is lawfully present at the place from which the evidence can be plainly viewed; (2) the seizing officer has a lawful right of access to the object itself; and (3) the object's incriminating character is immediately apparent." *United States v. Williams*, --- F.3d -----, 2010 WL 251592 at *8 (4th Cir. Jan. 21, 2010) (internal quotations omitted). This exception "does not involve an invasion of privacy and, consequently, does not constitute a search implicating the Fourth Amendment." *United States v. Jackson*, 131 F.3d 1105, 1108 (4th Cir. 1997).

In this instance, Sheriff Holcomb was lawfully present on the road in front of Young, Sr.'s home. He had been alerted to an unusual trailer by a Triad employee, in an area off of the Youngs' property. Sheriff Holcomb had further been invited to investigate the trailer at this wellhead. Triad maintains a right-of-way on the road crossing the Youngs' property and leading to this particular well. The incriminating character of at least one object was also apparent to Sheriff Holcomb. Sitting alongside the road was a red enclosed trailer, and the Sheriff knew that a red utility trailer matching this description had been reported missing in Ohio, but had not yet been recovered.

With regard to the second element, the requirement that a police officer have a "lawful right of access to the object" is "simply a corollary of the familiar principle . . . that no amount of

14

probable cause can justify a warrantless search or seizure absent exigent circumstances." *Horton v. California*, 496 U.S. 128, 137 n.7 (1990). Defense counsel argued, and the Court accepts, that there were no exigent circumstances that would forgive the failure to get a warrant if one were needed. However, the second element can be satisfied by the same "open fields" analysis as before, and the Court incorporates that analysis here. The Youngs had no expectation of privacy in objects left beside a well-traveled access road, when that property was not immediately surrounding the home and no steps had been taken to prevent its viewing by passers-by.

In conclusion, the warrant issued to Sheriff Holcomb by the magistrate is not based on a "bare bones" affidavit, nor is it founded on an intentionally misleading affidavit. Further, the Court finds that, regardless of the validity of the warrant, these four trailers were located in open fields and in plain view and therefore no warrant was required because Young, Sr. had no reasonable expectation of privacy associated with them. Therefore, the Motion to Suppress with respect to the March 30, 2006 search is **DENIED**.

### C. CONCLUSION

For the foregoing reasons, the Court **DENIES** Defendants' Motion to Suppress [Docket 41-4, Docket 68-1].

**IT IS SO ORDERED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to the Defendants and their counsel, the United States Attorney, the United States Probation Office, and the United States Marshal.

        ENTER:       February 22, 2010

_____
THOMAS E. JOHNSTON
UNITED STATES DISTRICT JUDGE